[Cite as *State v. Bressi*, 2016-Ohio-5211.]

| STATE OF OHIO | ) | | IN THE COURT OF APPEALS |
|---|---|---|---|
| | )ss: | | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | | |

| STATE OF OHIO | | C.A. No. 27575 |
|---|---|---|
| Appellee | | |
| v. | | APPEAL FROM JUDGMENT ENTERED IN THE |
| JAMES P. BRESSI | | COURT OF COMMON PLEAS COUNTY OF SUMMIT, OHIO |
| Appellant | | CASE No. CR 2013 08 2314 |

DECISION AND JOURNAL ENTRY

Dated: August 3, 2016

WHITMORE, Judge.

{¶1} Defendant-Appellant, James Bressi, appeals from his conviction in the Summit County Court of Common Pleas. This Court affirms.

I

{¶2} Summit Pain Specialists is a medical organization that specializes in the treatment of individuals suffering from chronic pain. Before the events giving rise to this appeal, Bressi owned Summit Pain Specialists and operated it alongside his business partner, Dr. Robert Geiger. Bressi received his training in osteopathic medicine and frequently treated his patients using osteopathic manipulative treatment ("OMT"), a technique wherein an individual uses his hands to stretch and exert pressure on various muscles and joints to achieve optimal alignment and relieve pain. Starting in 2012, individuals began contacting the Stow Police Department to report that Bressi had engaged in inappropriate sexual contact with them when they came to him for treatment. The reports launched an intensive investigation led by Detective Jeff Swanson,

who interviewed numerous patients and other individuals who had contact with Bressi. In March 2013, amidst accusations of inappropriate conduct and his breach of an office policy requiring the presence of chaperones during OMTs, Bressi was terminated from Summit Pain Specialists. Sixth months later, the Stow Police Department's investigation culminated in his arrest.

{¶3} A grand jury indicted Bressi on two counts of rape, thirteen counts of gross sexual imposition, and twelve counts of sexual imposition. The twenty-seven counts pertained to eleven different victims, ten of whom were Bressi's patients and one of whom, C.H., was a nurse on his staff. The incidents underlying the twenty-seven counts were alleged to have occurred at different times between May 2011 and March 2013.

{¶4} Several weeks before his scheduled trial date, Bressi sought a continuance because he received a significant amount of additional discovery from the State. Specifically, Bressi informed the court that he had just received "96 Cds of recorded calls by complainants to the Stow Police Department." Although the recordings had existed for "some time," Bressi wrote, the State did not divulge them earlier in the discovery process. Bressi requested additional time to review the recordings and prepare for trial, and the court granted his request.

{¶5} The afternoon before Bressi's rescheduled trial date, he filed a motion to dismiss his indictment due to alleged discovery violations on the part of the State. The trial court dealt with the motion on the morning of trial by questioning both parties, Detective Swanson, and Timothy Dimoff, Bressi's private investigator. Because the court ultimately concluded that no discovery violations had occurred, it denied Bressi's motion to dismiss. The trial went forward as scheduled, but, at several points throughout the trial, Bressi renewed his motion to dismiss for alleged discovery violations. Consistent with its earlier ruling, the court denied Bressi's motion each time he renewed it.

{¶6} The jury found Bressi guilty of a single count of sexual imposition and not guilty of the remaining twenty-six counts against him. The court sentenced Bressi to fifty-nine days in jail, five years of probation, and a fine. Additionally, the court classified him as a tier one sexual offender. The court agreed to stay Bressi's sentence for purposes of appeal.

{¶7} Bressi now appeals from his conviction and raises three assignments of error for our review. For ease of analysis, we rearrange his assignments of error.

II

Assignment of Error Number Three

THE TRIAL COURT ERRED IN DENYING THE APPELLANT'S MOTION TO DISMISS AND SUBSEQUENT MOTION TO CONTINUE BECAUSE THE APPELLEE WILLFULLY AND KNOWINGLY WITHHELD EVIDENCE WHICH COULD HAVE BEEN DEEMED EXCULPATORY AND WAS ABSOLUTELY A DISCOVERY VIOLATION PER CRIM.R. 16.

{¶8} In his third assignment of error, Bressi argues that the trial court erred when it denied his motion to dismiss his indictment due to discovery violations on the part of the State. He also argues that the court erred when it refused to continue his trial for the purpose of investigating whether the State withheld exculpatory evidence. We do not agree that the trial court erred.

{¶9} "A trial court's resolution of discovery issues in criminal matters is reviewed for an abuse of discretion." *State v. Sadeghi*, 9th Dist. Wayne No. 14AP0051, 2016-Ohio-744, ¶ 14. An abuse of discretion means that the trial court was unreasonable, arbitrary, or unconscionable in its ruling. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). When reviewing for an abuse of discretion, an appellate court may not merely substitute its judgment for that of the trial court. *Pons v. Ohio State Med. Bd.*, 66 Ohio St.3d 619, 621 (1993).

{¶10} "Pursuant to *Brady*[ *v. Maryland*, 373 U.S. 83 (1963)], the State may not withhold 'material, exculpatory evidence,' as doing so offends a criminal defendant's due process rights." *State v. Charlton*, 9th Dist. Lorain No. 12CA010206, 2014-Ohio-1330, ¶ 32, quoting *State v. Moultry*, 9th Dist. Summit No. 25065, 2010-Ohio-3010, ¶ 9. "There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *State v. Jalowiec*, 9th Dist. Lorain No. 14CA010548, 2015-Ohio-5042, ¶ 31, quoting *Strickler v. Greene*, 527 U.S. 263, 281-282 (1999). "It is [the] [d]efendant's burden to establish that the evidence is both favorable and material and that there is reasonable probability that the outcome would have been different if the evidence had been provided." *State v. Whalen*, 9th Dist. Lorain No. 08CA009317, 2008-Ohio-6739, ¶ 8.

{¶11} Apart from *Brady v. Maryland*, a defendant may seek relief under Crim.R. 16 when he or she believes the State has violated the discovery rules by willfully failing to disclose exculpatory, material evidence. *See State v. Joseph*, 73 Ohio St.3d 450, 458 (1995). The rule "allows the trial court to 'grant a continuance, or prohibit the party from introducing in evidence the material not disclosed, or it may make such other order as it deems just under the circumstances.'" *State v. Price*, 9th Dist. Medina No. 14CA0070-M, 2015-Ohio-5043, ¶ 6, quoting Crim.R. 16(L)(1). "[A] trial court must inquire into the circumstances producing [an] alleged violation of Crim.R. 16." *State v. Bellomy*, 9th Dist. Wayne No. 97CA0036, 1998 WL 161292, *2 (Apr. 8, 1998). This Court has held that "[t]he rule 'requires the [S]tate to produce only items in the prosecutor's custody * * *." *Sadeghi* at ¶ 17, quoting *State v. Luskin*, 9th Dist. Lorain No. 90CA004766, 1990 WL 203479, *2 (Dec. 12, 1990).

{¶12} The afternoon before his scheduled trial, Bressi filed a motion to dismiss the charges against him "for repeated and what now only can be assumed to be purposeful violations of Criminal Rule 16 and *Brady v. Maryland* * * *." Bressi wrote that, earlier on in the discovery process, the State had produced recordings made by the Stow Police Department and had represented that those recordings were the only ones that existed. Another recording "mysteriously appeared" later on, however, after Bressi questioned its existence and was told it did not exist. Further, the State later produced an additional 96 CDs, all of which were recordings made when individuals had phoned the Stow Police Department about him or his case. Bressi wrote that he hired a private investigator to assist him in preparing his defense and his investigator had identified at least eight other individuals who stated that their police interviews had been recorded, but for whom he had no recordings. The additional, undisclosed recordings from the eight individuals formed the basis of Bressi's claim that the State had violated both Crim.R. 16 and *Brady*.

{¶13} The morning of trial, the trial judge addressed Bressi's motion to dismiss on the record. Defense counsel acknowledged that he had been aware of the possible existence of the additional recordings for several weeks, but stated that he waited to bring the matter to the trial court's attention because he was still researching the issue and his investigator was finalizing his report. He provided the court with the names of eight individuals, each of whom the defense believed was recorded by the police department when interviewed. Meanwhile, the prosecutor represented to the court that the State had provided the defense with all of the recordings in the State's possession. The trial court then spoke with both Detective Jeff Swanson, the detective in charge of the Stow Police Department's investigation, and Timothy Dimoff, Bressi's private investigator.

{¶14} Detective Swanson informed the court that it was not his practice to record his interviews with victims and witnesses, absent unique circumstances. He stated that he had direct involvement with all eight of the individuals that the defense identified. Specifically, he stated that he either conducted all of those interviews himself or was present when interviews were conducted. He represented to the court that those eight individuals were not recorded by any means when they were interviewed. Detective Swanson stated that he generated reports following the interviews and that he had produced all of his reports.

{¶15} After speaking with Detective Swanson, the court placed Dimoff under oath. Dimoff testified that members of his investigative team had received affirmative responses when they asked each of the eight individuals at issue whether they either felt or knew that they had been recorded by law enforcement. He admitted that he did not personally interview any of the eight individuals. He further admitted that the question posed to the individuals allowed for the possibility that they felt they had been recorded when, in reality, they had not been. Dimoff also acknowledged the possibility that the individuals had been recorded in conjunction with the civil suits against Bressi and had not understood the difference between the civil and criminal proceedings.

{¶16} Following Dimoff's testimony, the court overruled Bressi's motion to dismiss. Bressi then asked the court to continue the trial for the purpose of calling individuals to court, placing them under oath, asking them whether they were recorded, and determining "whether or not there is exculpatory evidence." The trial court likewise denied Bressi's request, and the matter proceeded to trial.

{¶17} At trial, Bressi renewed his motion to dismiss multiple times. He did so because, on cross-examination, four of his accusers testified that they were recorded when the Stow Police

Department interviewed them. After the first accuser testified that she had been recorded, the court spoke to the parties outside the presence of the jury. The prosecutor consulted with Detective Swanson and informed the judge that Detective Swanson had personally interviewed the accuser and did not record her interview. The court then overruled Bressi's renewed motion and the trial resumed. After the second accuser testified that she had been recorded, the court stopped the proceedings, removed the jury from the courtroom, and placed Detective Swanson under oath. Detective Swanson testified that he personally interviewed the accuser and did not record her. He testified that he could not account for the discrepancy regarding the existence of the recordings, but that he only recorded one interview out of the ninety-five he conducted. He verified that he produced that one recorded interview for the defense. The court then overruled Bressi's renewed motion to dismiss.

{¶18} After Bressi renewed his motion to dismiss a third and fourth time, the court expounded upon its decision to deny his motion. The court acknowledged that there was a discrepancy between some of the accusers, who recalled having been recorded, and Detective Swanson, who testified that no recordings were made. The court indicated that it had made a credibility determination based on the testimony it had heard about the purported existence of the recordings. Because the court concluded that the recordings did not exist, it denied Bressi's motion to dismiss. In doing so, the court noted that there also was no evidence that Bressi had suffered any prejudice as a result of his not having been provided with the recordings that he claimed existed.

{¶19} Bressi argues that the trial court erred by not dismissing his indictment because he set forth evidence that the State willfully withheld materials that "could have been deemed exculpatory." He points to the testimony of his private investigator as well as the testimony of

the accusers who said they were recorded. Because he specifically requested the recordings and the State failed to preserve them, Bressi argues, the burden should have shifted to the State to prove that the recordings were not exculpatory and material to his defense. *See State v. Glunt*, 10th Dist. Franklin No. 09AP-962, 2010-Ohio-3024, ¶ 10. He further argues that the court erred by not continuing the trial "so that the witnesses who claimed they were recorded could give testimony regarding said recordings * * *."

{¶20} Upon review of the record, we cannot conclude that the trial court abused its discretion when it denied Bressi's motion to dismiss and refused to continue the matter to conduct additional inquiries. Initially, we note that only two of the eight individuals who were the subject of Bressi's motion to dismiss actually testified at trial. Those individuals were J.G. and C.H. The other six individuals never testified and were not identified as victims or named in Bressi's indictment. As for J.G. and C.H., Bressi only asked J.G. if the police department recorded her interview. Bressi never asked C.H. on cross-examination if the police recorded her interview, and the sexual imposition count involving C.H. was the only count upon which Bressi was convicted. Accordingly, his sole conviction did not stem from any of the accusers or individuals who claimed that their interviews with the police were recorded. Moreover, he never demonstrated that the State actually withheld exculpatory evidence from him.

{¶21} Bressi argues that it was not his burden to demonstrate that the recordings were exculpatory and material to his defense because he specifically requested them and the State either lost or destroyed them. He argues that, in those circumstances, the burden shifts to the State. *See Glunt* at ¶ 10. *See also State v. Whalen*, 9th Dist. Lorain No. 08CA009317, 2008-Ohio-6739, ¶ 8-9. Here, however, there was an absence of proof that the State actually lost or destroyed the recordings. Detective Swanson repeatedly represented to the court and testified

under oath that he personally interviewed each of the individuals at issue and did not record them. The trial court then deemed Detective Swanson's testimony credible. For a *Brady* violation to occur, the State must have actually withheld evidence. *See Charlton*, 2014-Ohio-1330, at ¶ 32. Likewise, Crim.R. 16 "requires the [S]tate to produce only items in the prosecutor's custody * * *." *Sadeghi*, 2016-Ohio-744, at ¶ 17, quoting *Luskin*, 1990 WL 203479, at *2. The trial court here inquired at length about the existence of the recordings. The court questioned several prosecutors, Bressi's private investigator, and Detective Swanson. It stopped the proceedings more than once to conduct further inquiries and ensured that Detective Swanson was questioned regarding each of the individuals who claimed that they either felt or remembered having been recorded. Absent any additional proof that the interviews were, in fact, recorded, the court determined that the recordings did not exist.

{¶22} This Court is troubled that several of the accusers in this matter testified that they recalled having been recorded by the Stow Police Department. Their testimony stands in stark contrast to that of Detective Swanson, who testified that he did not record them. In light of their contrasting testimony and the absence of any additional proof that the recordings existed, however, this Court must defer to the trial court's assessment of the matter. The trial court was in the best position to hear the testimony on this issue, evaluate its credibility, and resolve the factual dispute that existed. *See State v. McNeil*, 9th Dist. Summit No. 27720, 2016-Ohio-4669, ¶ 16. Having reviewed the record, we cannot conclude that the court abused its discretion by resolving the matter in the foregoing manner and denying Bressi's motion to dismiss. *See Sadeghi* at ¶ 14.

{¶23} To the extent Bressi claims that the court erred by not granting him a continuance, we likewise cannot conclude that the court abused its discretion in denying his request. *See State*

*v. Shinholster*, 9th Dist. Summit No. 27687, 2015-Ohio-5098, ¶ 11 (decision to grant or deny continuance left to trial court's sound discretion). Bressi acknowledged that he waited until the afternoon before his rescheduled trial date to bring the issue of the recordings to the court's attention. He sought a continuance for the purpose of asking the State's witnesses whether they had been recorded, but Detective Swanson affirmatively testified that no such recordings were made. It is pure speculation that any additional questioning of the witnesses would have caused Detective Swanson to change his testimony. As such, we must conclude that the trial court did not abuse its discretion by denying Bressi's request for a continuance or by refusing to dismiss the charges against him. Bressi's third assignment of error is overruled.

Assignment of Error Number One

THE TRIAL COURT ERRED IN NOT GRANTING THE APPELLANT'S CRIM.R. 29 MOTION TO DISMISS BECAUSE THERE WAS INSUFFICIENT EVIDENCE PRESENTED TO THE JURY TO FIND HIM GUILTY OF SEXUAL IMPOSITION PER THE REQUIREMENTS SET FORTH BY R.C. 2907.06(A)(1) AND R.C. 2907.06(B).

**{¶24}** In his first assignment of error, Bressi argues that his sexual imposition conviction is based on insufficient evidence. Specifically, he argues that the court should have granted his Crim.R. 29 motion because the State failed to set forth any evidence to corroborate the victim's testimony. We disagree.

**{¶25}** "We review a denial of a defendant's Crim.R. 29 motion for acquittal by assessing the sufficiency of the State's evidence." *State v. Frashuer*, 9th Dist. Summit No. 24769, 2010-Ohio-634, ¶ 33. Sufficiency concerns the burden of production and tests whether the prosecution presented adequate evidence for the case to go to the jury. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential

elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶26} The sexual imposition statute provides, in relevant part, that "[n]o person shall have sexual contact with another, not the spouse of the offender[,] * * * when * * * [t]he offender knows that the sexual contact is offensive to the other person, * * * or is reckless in that regard." R.C. 2907.06(A)(1). The statute further provides that a person may not be convicted of sexual imposition "solely upon the victim's testimony unsupported by other evidence." R.C. 2907.06(B). The corroboration requirement is not a "question of proof" for the jury, but "a threshold inquiry of legal sufficiency to be determined by the trial judge." *State v. Economo*, 76 Ohio St.3d 56, 60 (1996). "The corroborating evidence necessary to satisfy R.C. 2907.06(B) need not be independently sufficient to convict the accused, and it need not go to every essential element of the crime charged. Slight circumstances or evidence which tends to support the victim's testimony is satisfactory." *Id.*

{¶27} C.H. testified that she worked at Summit Pain Specialists for a total of about fourteen years. In January 2012, she accepted a position at the Stow location with Bressi. C.H. testified that she was familiar with Bressi because she previously had worked with him at a different office. She stated that, after she accepted her position at the Stow office, she worked as a triage nurse and was typically in the office from 7:30 a.m. until 4:30 p.m. One day in March or April 2012, C.H. stayed late at the office to finish returning phone calls. When she finished, she went to say goodbye to Bressi and he asked how she was doing. C.H. testified that Bressi was aware that she was emotionally fragile at the time because he knew her son had died the previous year and he knew she was scheduled to have a heart catheterization performed. She testified

that, when she told Bressi she did not care what happened to her, he asked her to come back to one of the office visit rooms.

{¶28} C.H. stated that Bressi closed the examination room door behind her and had her lie face down on the examination table. He then started massaging her back and shoulders. C.H. indicated that, when she lay down on the table, she placed her arms at her sides with her palms facing up. As Bressi massaged C.H., she began to feel his penis rubbing in her palm. C.H. testified that she attempted to stop the connection by placing her hands up over her head, but Bressi then took her arms, moved them back down to her sides, and continued to rub his penis against her hand. C.H. then tried again to move her arms, and Bressi once again moved them back into position, rubbing his penis against her. At that point, C.H. testified that she fisted both of her hands. Bressi then brought her left arm out to the side, massaged her hand until she opened it, and placed it back down on her side. He continued rubbing farther down her back until he reached the top of her pants and "scooted [them] down."

{¶29} C.H. testified that Bressi began "touching at [her] vaginal area," so she immediately told him that his touch was too personal. After she did so, Bressi stopped touching her near her vagina, but told her that "it wasn't for him," but for her because she "needed the release." C.H. testified that she had received OMTs from Bressi in the past, but they never involved him placing his fingers near her vagina or rubbing his penis on her. She testified that she began crying on the examination table and, while she continued to cry, Bressi had her roll onto her back. Bressi then performed several adjustments before C.H. told him that she needed to go. C.H. got down from the table and left the room. She testified that Bressi left the building with her and spoke to her as they were crossing the parking lot. According to C.H., Bressi told her that she needed to go home because she and her husband "needed to f*** [their] brains out."

{¶30} C.H. testified that she continued to work at Summit Pain Specialists after her encounter with Bressi because she could not afford to leave her job and similar nursing positions were not readily available. She testified that she waited two weeks to tell her husband what had happened because she was afraid of how he would react. Meanwhile, a few days after the incident, she told Dr. Geiger what Bressi had done. According to C.H., Dr. Geiger told her that she "had his backing" if she chose to contact the police, but that it was her decision to make. She testified that, following her disclosure to Dr. Geiger, a new office policy was put into effect. Per the policy, no medical massages were to be performed and no OMTs were to be performed without another employee being present in the room. C.H. testified that she never intended to report Bressi to the police, but the police later contacted her while investigating Bressi. She then met with the police and gave a written statement.

{¶31} Tricia Kay testified that, from 2010 to 2012, she worked as a registered nurse at Summit Pain Specialists. Kay saw Bressi once or twice a week on the days that they performed procedures on patients requiring sedation and recovery. She testified that, around the start of 2011, she began to notice a change in Bressi. Specifically, she observed that he began to appear disheveled, wearing wrinkled clothes and failing to keep his hands clean. Kay testified that she knew C.H. because they worked together during her time at Summit Pain Specialists. She confirmed that she was present when C.H. spoke to Dr. Geiger "about Dr. Bressi and some illegal conduct." She stated that one of the reasons she left Summit Pain Specialists in 2012 was because she "felt something wasn't right."

{¶32} Patti Herink testified that she was currently employed as a registered nurse at Summit Pain Specialists and had been working there for about four years. Much like Kay, Herink testified that she observed a change in Bressi's appearance over the course of her

employment. Specifically, she began noticing in 2012 that his hygiene was suffering, that he was failing to keep his clothing clean, and that he appeared more irritable than usual. She also testified that, in 2012, a new written office policy was issued in regards to Bressi and his female patients. Per the policy, no OMTs were to be performed without a chaperone in the room and, if the patient was a female, the chaperone also had to be a female.

{¶33} The State presented evidence that Bressi was terminated from Summit Pain Specialists in March 2013. While cross-examining Detective Swanson, defense counsel played a recording of Detective Swanson's interview with H.S., a patient with whom the police believed Bressi was having a consensual sexual relationship. During the recorded interview, Detective Swanson informed H.S. that Bressi had been terminated from Summit Pain Specialists because he had violated the office policy against performing OMTs without a chaperone and there were allegations that he had sexually abused patients. Detective Swanson confirmed on redirect examination that he had reviewed Bressi's termination letter in the course of his investigation and that it outlined the alleged misconduct that led to his termination.

{¶34} Bressi argues that the court erred by allowing his sexual imposition charge to go to the jury because the State failed to present any evidence to corroborate C.H.'s testimony. *See* R.C. 2907.06(B). He argues that neither Dr. Geiger, nor C.H.'s husband testified at trial, so there was no testimony from either of the people to whom she claimed to have reported the incident. Without their testimony, Bressi argues, the State could not rely on C.H.'s self-serving testimony that she told them about the incident. He also argues that C.H. could not support her allegations with a promptly filed police report because she failed to speak to the police about the incident for more than a year.

{¶35} We do not agree that the trial court erred by denying Bressi's motion for acquittal. To satisfy R.C. 2907.06(B)'s corroboration requirement, the State need only have set forth "[s]light circumstances or evidence which tend[ed] to support [C.H.]'s testimony." *Economo*, 76 Ohio St.3d at 60. C.H. testified that the incident with Bressi occurred in March or April 2012 and that she told Dr. Geiger about the incident a few days after it occurred. She further testified that, as a result of that conversation, a new office policy was put into effect whereby chaperones were required to be in the room for any OMTs. Even assuming that the State could not rely on C.H.'s own testimony about her timely reports of the incident to Dr. Geiger and her husband to satisfy the corroboration requirement, the State also presented the testimony of Kay and Herink. Kay confirmed that she was present when C.H. spoke to Dr. Geiger about Bressi and his "illegal conduct." Meanwhile, Herink testified that Summit Pain Specialists instituted a new written office policy in 2012 regarding Bressi and his female patients. She testified that the policy required chaperones to be in the room for OMTs. Thus, their testimony tended to support portions of C.H.'s testimony.

{¶36} The State also presented evidence that Bressi was terminated in March 2013 because he had violated the office policy against performing OMTs without a chaperone and there were allegations that he had sexually abused patients. Even though Bressi was not ultimately convicted on the remaining counts against him, at the time he made his motion for acquittal, the court was bound to view all of the evidence in a light most favorable to the State. *See Jenks*, 61 Ohio St.3d 259 at paragraph two of the syllabus. The court could have considered the fact that Bressi was terminated from his practice amidst allegations of sexual misconduct in deciding whether the State presented enough evidence to satisfy R.C. 2907.06(B)'s corroboration requirement with regard to C.H. *See Economo* at 60 (corroboration requirement "a threshold

inquiry of legal sufficiency to be determined by the trial judge, not a question of proof"). Viewing that evidence in conjunction with C.H.'s testimony, as well as the testimony of Kay and Herink, the court could have concluded that the State satisfied the corroboration requirement. Consequently, we do not agree that the court erred when it denied Bressi's Crim.R. 29 motion on the sexual imposition count pertaining to C.H. Bressi's first assignment of error is overruled.

Assignment of Error Number Two

THE JURY LOST ITS WAY IN FINDING THE APPELLANT GUILTY OF SEXUAL IMPOSITION BECAUSE THE CONVICTION IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶37} In his second assignment of error, Bressi argues that his sexual imposition conviction is against the manifest weight of the evidence. We disagree.

{¶38} In determining whether a conviction is against the manifest weight of the evidence an appellate court:

> must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986). Weight of the evidence concerns whether a greater amount of credible evidence supports one side of the issue than supports the other. *Thompkins*, 78 Ohio St.3d at 387. Further, when reversing a conviction on the basis that the conviction was against the manifest weight of the evidence, "the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." *Id.*, quoting *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). Therefore, the Court's "discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs

heavily against the conviction." *State v. Browning*, 9th Dist. Summit No. 26687, 2013-Ohio-2787, ¶ 14, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).

{¶39} Bressi argues that the jury lost its way in convicting him because C.H. contradicted herself when testifying and "not a single witness came to court to testify on [her] behalf * * *." Bressi notes that C.H. initially claimed to have spoken with the police about Bressi's conduct within a month of it occurring, but later admitted on cross-examination that she did not speak to the police for over a year. He further notes that C.H. returned to work the day after the alleged incident and there was never any evidence that she avoided him from then on.

{¶40} C.H. testified on direct examination that she believed she spoke with the police in April 2012 and that they were the ones to contact her because she never intended to file a report. On cross-examination, C.H. estimated that it was "probably a month" between when the incident occurred and when she spoke with the police. Defense counsel then presented her with the written statement she gave to the police. When C.H. saw that the statement was dated May 2013, she admitted that she did not speak to the police for fourteen or fifteen months and that she had been mistaken about the timing. As for her continuing to work at Summit Pain Specialists after the incident, she explained that she could not afford to leave her job. She testified that it made her uncomfortable to be near Bressi, but that similar nursing jobs were not readily available.

{¶41} Bressi testified in his own defense and denied that he ever engaged in offensive sexual contact with C.H. or any of his other patients or employees. He testified that he believed C.H. "misunderstood" their encounter because she was under a large amount of stress. Bressi admitted that he touched C.H. near her vagina, but claimed that he did so as part of the OMT he was performing on her. He further claimed that, in the past, he had touched C.H. in the same

manner. As to C.H. stating that she felt him rubbing his penis on her hand, Bressi attributed her confusion to bottles of Stevia and silver that he routinely carried in his pocket. He testified that the bottles were "rather phallic-like in their structure" and frequently rubbed against his patients when he performed OMTs. He also testified that someone may have caused C.H. to believe he might touch her inappropriately. It was Bressi's contention at trial that his partner, Dr. Geiger, was conspiring to oust him from their practice. Bressi testified that he "believe[d] Dr. Geiger had talked to [C.H.] and [had given] her a heads-up about possibly my manipulation techniques not being above board."

{¶42} Having reviewed the record, we cannot conclude that Bressi's sexual imposition conviction is against the manifest weight of the evidence. Bressi conceded that he performed an OMT on C.H. and that he touched her near her vagina. Accordingly, there was no dispute that the encounter between them occurred. The only question was whether, during that encounter, Bressi knowingly or recklessly engaged in offensive sexual contact with C.H. While neither Dr. Geiger, nor C.H.'s husband testified on behalf of the State, the jury was able to hear C.H.'s testimony and assess her credibility. Additionally, the jury was able to assess Bressi's credibility and weigh his version of the events against C.H.'s version of the events. "This Court has repeatedly held that the trier of fact is in the best position to determine the credibility of witnesses and evaluate their testimony accordingly." *State v. Johnson*, 9th Dist. Summit No. 25161, 2010-Ohio-3296, ¶ 15. "This Court will not overturn a conviction as being against the manifest weight of the evidence simply because the trier of fact chose to believe the State's version of events over another version." *State v. Barger*, 9th Dist. Medina No. 14CA0074-M, 2016-Ohio-443, ¶ 29. Bressi has not shown that this is the exceptional case where the jury lost

its way by convicting him.  *See Otten*, 33 Ohio App.3d at 340.  Thus, his second assignment of error is overruled.

III

{¶43}  Bressi's assignments of error are overruled.  The judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

––––––

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution.  A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run.  App.R. 22(C).  The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

BETH WHITMORE
FOR THE COURT

HENSAL, P. J.
MOORE, J.
CONCUR.

APPEARANCES:

MICHAEL T. CALLAHAN, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and RICHARD S. KASAY, Assistant Prosecuting Attorney, for Appellee.