[Cite as *State v. Hudson*, 2018-Ohio-1920.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

STATE OF OHIO

    Appellee

    v.

WESLEY R. HUDSON

    Appellant

C.A. No.    28755

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE No.    CR-2017-04-1194-B

DECISION AND JOURNAL ENTRY

Dated: May16, 2018

TEODOSIO, Presiding Judge.

{¶1} Defendant-Appellant, Wesley Hudson, appeals from his convictions in the Summit County Court of Common Pleas. This Court affirms.

I.

{¶2} While driving home from work late one evening, the victim in this matter stopped at a gas station to purchase a few items. Mr. Hudson and his friend, Ronald Henry, were outside when the victim arrived and followed him into the lobby. The victim intended to make a work-related cash deposit the following morning, so he was carrying a money bag in his pocket. He removed the bag to pay at the register while Mr. Hudson and Mr. Henry watched. The two men then exited the store as the victim was completing his purchase.

{¶3} According to the victim, Mr. Hudson and Mr. Henry confronted him outside, threatened him, and demanded his money bag. According to Mr. Hudson, he and Mr. Henry confronted the victim, but never demanded his money. Mr. Hudson claimed that he and Mr.

Henry were angry with the victim because they heard him utter a racial slur when the three of them initially walked into the gas station lobby. It is undisputed that the encounter ended when the victim pulled out a knife, backed away, and returned to the lobby. As the victim did so, he saw Mr. Hudson and Mr. Henry climb into a car and drive away.

{¶4} After the gas station clerks called 911 and reported an attempted robbery, the police combed the area for a car matching the description of the one the victim had seen. They found a similar car at a nearby hotel and discovered Mr. Hudson and Mr. Henry in one of the rooms. Following further discussions and a search of the hotel room, the police arrested the men.

{¶5} A grand jury indicted Mr. Hudson, as well as Mr. Henry, on one count of robbery. A joint trial was held, and, at its conclusion, the jury found both men guilty. The court sentenced Mr. Hudson to three years in prison.

{¶6} Mr. Hudson now appeals from his conviction and raises two assignments of error for our review. For ease of analysis, we reorder his assignments of error.

II.

**ASSIGNMENT OF ERROR TWO**

THE TRIAL COURT COMMITTED REVERSIBLE AND PLAIN ERROR WHEN IT OVERRULED MR. HUDSON'S CRIM.R. 29(A) MOTION FOR JUDGMENT OF ACQUITTAL BECAUSE THE EVIDENCE WAS INSUFFICIENT TO SUPPORT A CONVICTION.

{¶7} In his second assignment of error, Mr. Hudson argues that the trial court erred by denying his Crim.R. 29(A) motion because the State presented insufficient evidence to sustain his conviction. We disagree.

{¶8} This Court reviews "a denial of a defendant's Crim.R. 29 motion for acquittal by assessing the sufficiency of the State's evidence." *State v. Frashuer*, 9th Dist. Summit No.

24769, 2010-Ohio-634, ¶ 33. "A sufficiency challenge of a criminal conviction presents a question of law, which we review de novo." *State v. Spear*, 9th Dist. Summit No. 28181, 2017-Ohio-169, ¶ 6, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). "Sufficiency concerns the burden of production and tests whether the prosecution presented adequate evidence for the case to go to the jury." *State v. Bressi*, 9th Dist. Summit No. 27575, 2016-Ohio-5211, ¶ 25, citing *Thompkins* at 386. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. In analyzing the sufficiency of the State's evidence, this Court does not "resolve evidentiary conflicts or assess the credibility of witnesses[] because these functions belong to the trier of fact." *State v. Hall*, 9th Dist. Summit No. 27827, 2017-Ohio-73, ¶ 10.

{¶9} The robbery statute provides, in relevant part, that "[n]o person, in attempting or committing a theft offense * * *, shall * * * [u]se or threaten the immediate use of force against another." R.C. 2911.02(A)(3).

> The use or threat of immediate use of force element * * * is satisfied if the fear of the alleged victim was of such a nature as in reason and common experience is likely to induce a person to part with property against his will and temporarily suspend his power to exercise his will by virtue of the influence of the terror impressed.

*State v. Davis*, 6 Ohio St.3d 91 (1983), paragraph one of the syllabus. "A defendant's actions and demeanor may support a finding of a threat of force." *State v. Smith*, 9th Dist. Summit No. 27389, 2015-Ohio-2842, ¶ 18. "'[E]valuation of the nature of a threat is subject to an objective, not subjective, test.'" *Id.*, quoting *State v. Sumlin*, 8th Dist. Cuyahoga No. 76261, 2000 Ohio App. LEXIS 2635, *5 (June 15, 2000).

{¶10} The victim testified that he stopped at a gas station on his way home from work one evening to purchase a few items. The victim was a manager at a pizza shop and frequently stopped at the gas station after closing the shop. He testified that it was nearly 1:00 a.m. when he arrived and that he had with him a money bag from the pizza shop. The bag contained approximately $200, which he intended to deposit at the bank in the morning.

{¶11} The victim decided to take the money bag into the gas station lobby with him, so he tucked it into the pocket of his hooded sweatshirt. As he entered the lobby, two men, later identified as Mr. Hudson and Mr. Henry, entered along with him. Both men were wearing black pants and black hooded sweatshirts with the hoods up. The victim testified that, after he selected his items and stepped to the register, Mr. Hudson and Mr. Henry also walked over and stood next to him. The victim then removed the money bag from his pocket and paid with some of the cash inside before returning the bag to his pocket. As he completed his purchase, Mr. Hudson and Mr. Henry turned and exited the lobby ahead of him.

{¶12} The victim testified that Mr. Hudson and Mr. Henry confronted him at his car, and one of them pushed his door shut when he attempted to open it. He stated that the men demanded his money bag and refused to let him into his car. He then informed the men that the money bag only contained $200 and asked if they were "going to rob [him] for $200." In response, the shorter of the two men (Mr. Hudson) demanded the money bag and stated: "Don't make me pull the hammer. Don't give us any problems." The victim stated that he became fearful as a result of the exchange because Mr. Hudson had his hands in the pockets of his hooded sweatshirt and, given his statement about "pull[ing] the hammer," he believed Mr. Hudson was concealing a weapon. He testified that he always carried a small knife in his pocket

and removed it after Mr. Hudson's statement. The victim held the knife aloft as he backed away towards the gas station lobby. Once inside, the gas station clerks called 911 on his behalf.

{¶13} Mr. Hudson argues that his robbery conviction is based on insufficient evidence because there was no evidence that he 1) committed or attempted to commit a theft offense, or 2) used or threatened to use force against the victim. As discussed below, he contends that he and Mr. Henry confronted the victim to address his use of a racial slur, not to demand money from him. Though the vast majority of his argument actually sounds in weight and not sufficiency, *see State v. Stark*, 9th Dist. Wayne No. 14AP0050, 2017-Ohio-873, ¶ 11, we briefly address his contention that the State failed to present any evidence on the two foregoing elements.

{¶14} Viewing the evidence in a light most favorable to the State, a rational trier of fact could have concluded that the State proved beyond a reasonable doubt that Mr. Hudson robbed the victim. *See Jenks*, 61 Ohio St.3d 259 at paragraph two of the syllabus. The victim testified that Mr. Hudson and Mr. Henry confronted him and demanded his money bag. At that point, the two men had already seen the victim in the gas station lobby, paying for his items with money from the money bag. The victim also testified that, when he hesitated to comply, Mr. Hudson demanded the money and cautioned the victim against making him "pull the hammer." Given the context surrounding Mr. Hudson's statement, including that he had his hands in the pockets of his sweatshirt when he made it, the jury reasonably could have concluded that he threatened the victim with force in attempting to commit a theft offense. *See Smith*, 2015-Ohio-2842, at ¶ 18. Accordingly, we reject his argument that the State presented insufficient evidence. Mr. Hudson's second assignment of error is overruled.

## ASSIGNMENT OF ERROR ONE

MR. HUDSON'S CONVICTION FOR ROBBERY WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶15} In his first assignment of error, Mr. Hudson argues that his conviction is against the manifest weight of the evidence. We disagree.

{¶16} This Court has stated:

In determining whether a criminal conviction is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986). "[W]hen reversing a conviction on the basis that it was against the manifest weight of the evidence, an appellate court sits as a 'thirteenth juror,' and disagrees with the factfinder's resolution of the conflicting testimony." *State v. Tucker*, 9th Dist. Medina No. 06CA0035-M, 2006-Ohio-6914, ¶ 5. This discretionary power "should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).

{¶17} A gas station clerk ("the first clerk") testified that he was working the evening of this incident, along with a second clerk. He was present in the lobby when the victim, Mr. Hudson, and Mr. Henry entered and never saw or heard the men exchange any words. The first clerk went outside for a short break after the men entered and returned while they were still in the lobby. He testified that the victim approached the second clerk at the register to pay for his items and Mr. Hudson and Mr. Henry stood behind him. As the victim was completing his purchase, however, Mr. Hudson and Mr. Henry exited the lobby without buying anything. The first clerk testified that the victim walked out directly after the two men. Shortly thereafter, the victim came back into the store and said that the two men had tried to rob him. According to the first clerk, the victim said that Mr. Hudson and Mr. Henry "met [him] out [by] [his] car, tried

holding the door shut while [he] was trying to get in, and [] said they had a gun." The second clerk then called 911.

{¶18} Sergeant Jerome Angerstein testified that he received a vehicle description in conjunction with the 911 call, so he decided to check nearby hotels for a car matching that description. A similar car was parked at a hotel located about one mile from the gas station, and the sergeant discovered Mr. Hudson and Mr. Henry in one of the hotel rooms along with a female. When the sergeant asked about the car outside, Mr. Henry admitted that he had been driving it. The sergeant then asked Mr. Henry if Mr. Henry knew why he was there, and Mr. Henry responded, "Yes, because of what happened at [the gas station]." Sergeant Angerstein testified that both Mr. Hudson and Mr. Henry were wearing t-shirts, but a search of the room revealed "at least one [hooded sweatshirt] balled up and shoved in the back corner of the under sink area." The sergeant confirmed that the police did not find any weapons in the room.

{¶19} The State introduced into evidence surveillance recordings taken from the gas station lobby that evening. Detective Joseph Storad reviewed the recordings in conjunction with his investigation and interviewed Mr. Hudson at the police station. He testified that the recordings were of an exceptional quality, complete with both video and audio. While reviewing them, the detective never heard the victim utter any racial slurs. He acknowledged that the surveillance system only had audio capabilities inside the store, such that it may not have captured statements uttered outside. He testified, however, that he was told the alleged racial slur was made inside the lobby.

{¶20} The recordings themselves depict Mr. Hudson and Mr. Henry entering the lobby at the same time as the victim. One cannot discern any type of reaction from Mr. Hudson and Mr. Henry as they enter and walk to the back of the lobby. In fact, the two men initially appear

to ignore the victim as he shops. Mr. Henry uses his cell phone for a brief period and slowly walks down one of the middle aisles while Mr. Hudson looks around. As the first clerk exits the lobby for his break, Mr. Henry then immediately puts away his cell phone and begins walking. He passes the victim on his way and stops in an area near the front of the lobby. Meanwhile, the victim finishes his shopping and heads to the front of the lobby with Mr. Hudson in his wake. The victim then continues to the register while Mr. Hudson stops alongside Mr. Henry, and the two briefly stand together. The two men then walk to the register and stand almost directly next to the victim, watching him as he pays for his items. As the victim completes his purchase, the two men turn to leave. The recording depicts them exiting the lobby directly ahead of the victim.

{¶21} Mr. Hudson testified in his own defense. According to Mr. Hudson, he was visiting Mr. Henry and Mr. Henry's girlfriend at a hotel when the two men decided to go get snacks. Mr. Henry drove them to a nearby gas station where they encountered the victim. Mr. Hudson testified that, as he and Mr. Henry were entering the lobby alongside the victim, he heard the victim quietly say, "[t]hose n*****s." Mr. Hudson stated that he was upset and humiliated by the comment, but Mr. Henry became very angry. He testified that he and Mr. Henry walked to the back of the lobby, talking and confirming that they had each heard the victim's comment. Mr. Henry then called his girlfriend and briefly spoke to her.

{¶22} Mr. Hudson testified that Mr. Henry followed the victim to the front of the lobby and began "staring him down" because he was so angry. He stated that he and Mr. Henry ultimately went outside with the victim to confront him, and possibly, to fight him. He confirmed that he shut the victim's car door during the confrontation and that the victim pulled out a knife. According to Mr. Hudson, he and Mr. Henry decided to leave when the victim

reentered the lobby and they realized the clerks were calling the police. He testified that he and Mr. Henry then returned to the hotel and took showers before the police arrived there.

{¶23} Mr. Hudson acknowledged that he had a prior conviction for robbery. He denied, however, that he ever demanded the victim's money or threatened him with a gun. He opined that if anyone committed a crime that evening it was the victim, as he pulled out a knife soon as they confronted him. Yet, he acknowledged that he and Mr. Henry left rather than waiting for the police. As to his hooded sweatshirt, Mr. Hudson testified that he removed it to take a shower and placed it inside the sink cabinet because he did not want to leave his dirty clothes on the floor.

{¶24} Mr. Hudson argues that his robbery conviction is against the manifest weight of the evidence because the record does not support the conclusion that he threatened the victim with force so as to commit a theft offense. He asserts that he only confronted the victim to address his use of a racial slur. Accordingly, he argues that the jury lost its way by convicting him.

{¶25} Having reviewed the record, this Court cannot conclude that the jury lost its way when it found Mr. Hudson guilty of robbery. The jury was essentially presented with two conflicting versions of the events. The victim testified that Mr. Hudson and Mr. Henry demanded his money bag and threatened him with violence. Meanwhile, Mr. Hudson testified that he and Mr. Henry only confronted the victim to address his use of a racial slur. The jury "[was] in the best position to determine the credibility of witnesses and evaluate their testimony accordingly." *State v. Johnson*, 9th Dist. Summit No. 25161, 2010-Ohio-3296, ¶ 15. This Court will not conclude that the jury lost its way simply because it "[chose] to believe the State's witnesses rather than [Mr. Hudson's] version of the events." *State v. Martinez*, 9th Dist. Wayne

No. 12CA0054, 2013-Ohio-3189, ¶ 16. Notably, the recording from the gas station did not lend support to Mr. Hudson's version of the events, as it did not capture any direct exchange between the two men and the victim or any discernable reaction from the two men at the point in time that Mr. Hudson claimed the victim insulted them. Upon review, Mr. Hudson has not shown that this is the exceptional case where the evidence weighs heavily against his conviction. *See Otten*, 33 Ohio App.3d at 340. Accordingly, we overrule his first assignment of error.

### III.

**{¶26}** Mr. Hudson's assignments of error are overruled. The judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

THOMAS A. TEODOSIO
FOR THE COURT

CARR, J.
HENSAL, J.
CONCUR.

APPEARANCES:

SHUBHRA N. AGARWAL, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and JACQUENETTE S. CORGAN, Assistant Prosecuting Attorney, for Appellee.